CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

JAN 11 2022

JULIA C. DUDLEY, CLERK
BY:  s/ H. MCDONALD
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| LATISHA R., on behalf of K.R.,[1] | ) | |
| a minor child, | ) | Civil Action No. 4:20-cv-00061 |
| Plaintiff, | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| KILOLO KIJAKAZI, | ) | By:    Joel C. Hoppe |
| Acting Commissioner of Social Security | ) | United States Magistrate Judge |
| Defendant.[2] | ) | |

Plaintiff Latisha R., proceeding on behalf of her minor son K.R., asks the Court to review

the Commissioner of Social Security's final decision denying K.R.'s claim for supplemental

security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383f.

The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the

administrative record, the parties' briefs, and the applicable law, I cannot find that substantial

evidence supports the Commissioner's determination.[3] Accordingly, I recommended that the

decision be reversed and the case be remanded under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see*

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials. The Court always refers to
minors by their initials.

[2] Acting Commissioner Kijakazi is hereby substituted as the named defendant in this action. 42 U.S.C. §
405(g); Fed. R. Civ. P. 25(d).

[3] I decline Latisha's request for oral argument, Pl.'s Br. 21, ECF No. 17, because the facts and legal
positions are adequately presented in the materials before the court and a hearing would not aid the
decisional process. *See* Fed. R. Civ. P. 78(b); W.D. Va. Gen. R. 4(c)(2). The Commissioner did not
request oral argument.

*also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only

whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether

substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th

Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v.*

*Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is

"more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount

of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review

considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera*

*Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir.

1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence

allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434

F.3d 650, 653 (4th Cir. 2005); *see Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). However,

"[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard

or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## II. Legal Framework

A child is "disabled" within the meaning of the Act if he or she "has a medically

determinable physical or mental impairment, which results in marked and severe functional

limitations, and which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). Social Security ALJs follow a three-step process to determine in the first instance whether a child claimant is disabled. The ALJ asks in sequence whether the child: (1) is working; (2) has a severe medically determinable impairment; and, if so, (3) the impairment or combination of impairments that meets, medically equals, or functionally equals any of the impairments listed in the Act's regulations. *Bryant v. Barnhart*, 63 F. App'x 90, 92–93 (4th Cir. 2003); 20 C.F.R. § 416.924(a).[4] Step three has two parts. The ALJ must first consider whether the child's severe impairment(s) meets or medically equals the criteria for any specific listed impairment. 20 C.F.R. §§ 416.925, 416.926; *see Sullivan v. Zebley*, 493 U.S. 521, 529–34 (1990). If it does, the child "is conclusively presumed to be disabled and entitled to benefits." *Bowen v. City of N.Y.*, 476 U.S. 467, 471 (1986); *see* 20 C.F.R. § 416.924(d)(1). If it does not, the ALJ moves on to the "functional equivalence" part of step three. 20 C.F.R. § 416.926a. This holistic, fact-specific determination requires the ALJ to evaluate how appropriately, effectively, and independently the child performs in "six domains" of functioning when compared to other children the same age "who do not have impairments," *id.* § 416.926a(b)(1), and to "rate the severity" of the child's impairment-related limitation in each affected domain, SSR 09-1p, 2009 WL 396031, at *2 (Feb. 17, 2009).[5] To "functionally equal" the listings, the child's medical impairment(s) must cause "marked limitation" in two domains or "extreme limitation" in one domain.[6] 20 C.F.R. §

---

[4] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

[5] "Domains are broad areas of functioning intended to capture all of what a child can or cannot do," *id.* at *1, both on a day-to-day basis and over time, *id.* at *9–10 & n.17. The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for himself or herself; and (6) overall health and physical well-being. 20 C.F.R. § 416.926a.

[6] "Marked limitation" means the "impairment(s) interferes seriously" with the child's "ability to independently initiate, sustain, or complete activities" compared to children the same age(s) who do not

416.926a(d). The claimant bears the burden of proving that he or she is disabled. *S.R. ex rel. R.R. v. Barnhart*, 371 F. Supp. 2d 796, 799 (W.D. Va. 2005).

## III. Background

In March 2018, Latisha applied for SSI alleging that four-year-old K.R. was disabled by attention deficit hyperactivity disorder ("ADHD"). Administrative Record ("R.") 99, 185–91, ECF No. 12-1. Disability Determination Services ("DDS"), the state agency, denied the claim initially in May 2018, R. 99–108, and upon reconsideration that August, R. 110–22. The DDS psychologists who reviewed K.R.'s records opined that he had two "severe" medical impairments, ADHD and a Personality/Impulse-Control Disorder, and that those impairments caused "less than marked" limitations in K.R.'s abilities to attend and complete tasks, interact and relate with others, and care for himself compared to other preschoolers who do not have impairments. *See* R. 102–04, 115–20. On October 9, 2019, Latisha appeared with counsel and testified at a hearing before ALJ Nicholas Foster. *See* R. 37–57. K.R., then age six, attended the hearing but did not participate. R. 37, 54–55. ALJ Foster asked Latisha about her son's medication, but he did not ask any questions about her son's alleged limitations. R. 54–55.

ALJ Foster issued an unfavorable decision on October 30, 2019. *See* R. 16–30. He found that K.R. was a preschooler (ages 3 to 6 years) in March 2018, and a school-age child (ages 6 to 12 years) in October 2019. R. 19 (citing 20 C.F.R. § 416.926a(g)(2)). K.R. had one "severe" medically determinable impairment, ADHD, but that impairment did not meet or medically equal the relevant childhood Listing. *See* R. 19–20 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 § 112.11). ALJ Foster found that K.R.'s severe ADHD caused "less than marked limitations" in his overall

---

have impairments. 20 C.F.R. § 416.926a(e)(2). "Extreme limitation" means the "impairment(s) interferes very seriously with [the] ability to independently initiate, sustain, or complete activities" compared to children the same age(s) who do not have impairments. *Id.* § 416.926a(e)(3).

abilities to interact with others and to concentrate, persist, or maintain pace, and "no limitations" in his overall abilities to understand, remember or apply information and to adapt and manage himself. R. 19–20.

Finally, after summarizing some of the relevant evidence in the record and weighing the DDS medical opinions, R. 21–23, ALJ Foster rated K.R.'s impairment-related limitation in each domain compared to the expected functioning of preschoolers and school-age children who do not have impairments, *see* R. 23–29. He found that K.R. had "less than marked limitation" attending and completing tasks and interacting and relating with others at an age-appropriate level; "no limitation" acquiring and using information, moving about and manipulating objects, caring for himself at an age-appropriate level; and "no limitation" in his health and physical well-being. R. 24–29. Thus, ALJ Foster concluded that K.R. had not been disabled at any time since March 1, 2018. R. 29. The Appeals Council declined to review that decision, R. 1–4, and this appeal followed.

## IV. Discussion

Latisha argues that ALJ Foster did not explain why he concluded that K.R.'s severe ADHD caused "less than marked" limitations attending and completing tasks and interacting and relating with others, R. 25–27, or how he weighed Latisha's testimony that K.R. had specific, more serious functional limitations in these domains compared to other preschoolers and school-age children who do not have impairments. *See generally* Pl.'s Br. 13–21. I agree. While I cannot say the record conclusively shows that K.R.'s severe ADHD caused "marked limitation[s]" in both domains during the relevant time, *id.* at 21, I also cannot say substantial evidence supports ALJ Foster's contrary findings that K.R. did not have such serious limitations when compared to typical children his age, R. 25–27. Accordingly, the Commissioner's decision should be reversed

and the case remanded for further proceedings. *See, e.g.*, *Elsie L. v. Berryhill*, No. 4:17cv50, 2018 WL 6981223, at *3 (W.D. Va. Dec. 4, 2018), *adopted*, 2019 WL 137617 (W.D. Va. Jan. 8, 2019) (reversing and remanding where ALJ made same legal errors).

*

ALJs use a special technique called the "'whole child' approach" to determine whether a child's severe medical condition(s) functionally equals the listings. SSR 09-1p, 2009 WL 396031, at *1; *see* 20 C.F.R. § 416.926a. The ALJ "focus[es] first on the child's activities" and "evaluate[s] how appropriately, effectively, and independently the child functions compared to children of the same age who do not have impairments." SSR 09-2p, 2009 WL 396032, at *1 (Feb. 18, 2009). After the ALJ "determine[s] how the child functions in all settings" and identifies which "activities are limited," he then identifies which "domains are involved in those activities." SSR 09-1p, 2009 WL 396031, at *2. "Domains are broad areas of functioning intended to capture all of what a child can or cannot do," *id.* at *1, both on a day-to-day basis and over time, *id.* at *9–10 & n.17. The ALJ must account for "the interactive and cumulative effects" of the child's medical impairment(s) and related symptoms[7] on his or her activities in each domain that the child uses to do those activities, based on the evidence in the case record. *Id.* at *2; *see, e.g.*, SSR 09-4p, 2009 WL 396033, at *4 (Feb. 18, 2009) ("[B]ecause the ability to attend and to complete tasks is involved in nearly everything a child does, an impairment(s) that affects this ability may cause limitations in other domains. . . . [F]or example, children with AD/HD may interrupt others in conversation or have difficulty taking turns during play

---

[7] "Symptoms" are the claimant's own description of his or her medical impairment. 20 C.F.R. § 416.902(n). "If the claimant is a child who does not describe, or cannot adequately describe, his [or her] symptoms the ALJ will accept as a statement of [the child's] symptom(s) the description given by the person who is most familiar with [the child], such as a parent, other relative, or guardian." *Gerette v. Colvin*, No. 7:15cv12, 2016 WL 1254611, at *8 (W.D. Va. Feb. 2, 2016) (internal quotation marks omitted), *adopted*, 2016 WL 1296082 (W.D. Va. Mar. 30, 2016).

activities," both of which are skills necessary to appropriately interact and relate with people).

Finally, the ALJ "rate[s] the severity" of the child's impairment-related limitation (e.g., "none,"

"moderate," "marked," "extreme") in each domain to determine whether the child is disabled. *Id.*

A child is entitled to SSI if his or her medical impairment(s) cause "marked" limitation in two

domains or "extreme" limitation in one domain. 20 C.F.R. § 416.926a(d).

"The critical element in [rating] the severity of a child's limitations is how appropriately,

effectively, and independently [he or she] performs age-appropriate activities," SSR 09-2p, 2009

WL 396032, at *3, compared to the expected "functioning of other children the same age who do

not have impairments," *id.* at *11. 20 C.F.R. §§ 416.924b(a), 416.926a(b). The ALJ should

evaluate "the kind, extent, and frequency of help or adaptations the child needs," the settings

where the child has trouble, and "all other factors" and evidence relevant to rating his or her

limitations, SSR 09-1p, 2009 WL 396031, at *3, considering the child's chronological age

throughout the relevant period, 20 C.F.R. § 416.924b(a). *L.D.R. by Wagner v. Berryhill*, 920 F.3d

1146, 1152–53 (7th Cir. 2019). For most domains, the regulations list skills or activities "that

illustrate the typical functioning of children in [five] different age groups,"[8] plus "examples of

limitations within the[se] domains." 20 C.F.R. § 416.926a(b)(1). Because "the examples do not

necessarily describe a 'marked' or 'extreme' limitation," however, the ALJ must "consider all of

the relevant information in [the] case record" when rating the claimant's limitations compared to

typical children within his or her same age group(s). *Id.* § 416.926a(i)(3).

Latisha focuses on Domain II, "Attending and Completing Tasks," and Domain III,

"Interacting and Relating with Others." *See* Pl.'s Br. 13–18. Domain II considers how well the

---

[8] Those age groups are: Newborns and young infants (birth to age 1 year); older infants and toddlers (ages
1 to 3 years); preschool children (ages 3 to 6 years); school-age children (ages 6 to 12 years); and
adolescents (ages 12 to 18 years). *See* 20 C.F.R. § 416.926a; SSR 09-1p, 2009 WL 396031, at *1 n.7.

child "focus[es] and maintain[s] attention" and how well he or she begins, carries through, and finishes activities, including the pace at which the child performs and transitions between tasks. 20 C.F.R. § 416.926a(h); *see* R. 24–25. Preschoolers without impairment should pay attention when spoken to directly, sustain concentration on play and learning activities, and complete some self-care tasks like feeding and dressing themselves. They "usually" should be able to wait their turn and willingly change activities when an adult "says it is time to do something else." *Id.* § 416.926a(h)(2)(iii); *see* R. 25. School-age children without impairment should focus and sustain attention well enough to follow directions, finish classroom or homework assignments, stay on task and in place when appropriate, participate in group sports, and complete age-appropriate chores "without extra reminders or accommodation." 20 C.F.R. § 416.926a(h)(2)(iv); *see* R. 25. Examples of limitations in Domain II include "repeatedly becom[ing] side-tracked from activities or frequently interrupt[ing] others," being "easily frustrated" and giving up on tasks, requiring "extra supervision to remain engaged in activity," and inability to "plan, manage time, or organize . . . to complete assignments or chores." 20 C.F.R. § 416.926a(h)(3); R. 25.

Domain III, "Interacting and Relating with Others," captures the child's ability to initiate and sustain emotional connections, cooperate and comply with rules and social norms, respect other people's belongings, and "respond to others appropriately and meaningfully." 20 C.F.R. § 416.926a(i). This Domain touches "all aspects of social interaction at home, at school, and in the community." *Id.* Thus, the child must "respond appropriately," considering his age, to social cues and "follow social rules for interaction and conversation" with classmates, friends, relatives, authority figures, and strangers. 20 C.F.R. § 416.926a(i)(1)(i)–(iv). Preschoolers without impairment should understand and follow simple rules most of the time, start using words instead of actions to express themselves, and be better able to share, show affection, and offer

help. *Id.* § 416.926a(i)(2)(iii); *see* R. 26. School-age children without impairment should start developing more lasting friendships with children their own age and "begin to understand how to work in groups and solve problems." 20 C.F.R. § 416.926a(i)(2)(iv). Responding "to others appropriately and meaningfully," *id.* § 416.926a(i)(1)(iii), also requires the child to pay attention and to "avoid impulsive thinking" or behaviors that impact other people, *id.* § 416.926a(h)(1)(i). *See, e.g.*, SSR 09-5p, 2009 WL 396026, at *3 (Feb. 17, 2009) ("A child with [ADHD] may antagonize others by impulsively cutting into a line.").

"There is no set formula" for determining functional equivalence. SSR 09-1p, 2009 WL 396031, at *9–10. The "child's day-to-day functioning may be considered 'seriously' or even 'very seriously' limited whether [his] impairments impact only one activity or limit several activities" within a domain. *R.S. ex rel. Herrera v. Berryhill*, 357 F. Supp. 3d 1033, 1037 (C.D. Cal. 2019) (quoting SSR 09-1p, 2009 WL 396031, at *9). Additionally, because "the effects of a child's impairments are considered" over time, he or she can "have a 'marked' or 'extreme' limitation in a domain 'even though [he] does not have serious or very serious limitations every day.'" *Id.* (quoting SSR 09-1p, 2009 WL 396031, at *9). Determining whether the child has "marked" or "extreme" limitation in a domain "depends on the importance and frequency of the limited activities and the relative weight" of all available evidence. SSR 09-1p, 2009 WL 396031, at *9, *10 ("[T]he rating of limitation [in] a domain is not an 'average' of what activities the child can and cannot do."). The ALJ "must consider each piece of evidence in the context of the remainder of the case record" to get "a full picture" of the child's activities and limitations, SSR 09-2p, 2009 WL 396032, at *12 n.24, compared to other children in the same age group(s) who do not have impairments, 20 C.F.R. §§ 416.924b(a), 416.926a(b). *See Krystal H. o.b.o. C.H. v. Saul*, No. 4:18cv68, 2020 WL 809246, at *8–9 (W.D. Va. Jan. 24, 2020), *adopted*, 2020 WL

806183 (W.D. Va. Feb. 18, 2020); *Johnson*, 2018 WL 1726422, at *3. The ALJ's written

decision should "provide sufficient detail" describing how he weighed that information so

subsequent reviewers can understand how he made his material findings, SSR 09-1p, 2009 WL

396031, at *3, and why he rejected any evidence showing the child had greater functional

limitations than what the ALJ found, *see generally Elsie L.*, 2018 WL 6981223, at *3–7.

**

ALJ Foster's decision does not satisfy this standard. To start, too much of his decision

was devoted to summary, R. 21–23 (summarizing Latisha's testimony, teacher questionaries,

treatment records, and DDS medical opinions), and not enough to logical, accurate analysis of

the pertinent factors and all relevant evidence in K.R.'s longitudinal record, R. 24, 25, 26–27, 28

(rating K.R.'s limitation in each domain). *See Sabrina R. obo S.P. v. Kijakazi*, No. 4:20cv35,

2021 WL 3614436, at *5 (W.D. Va. Aug. 10, 2021) (reversing and remanding where ALJ made

same error); *Lakesha B. obo N.A.R. v. Saul*, No. 4:19cv35, 2021 WL 372798, at *9 (W.D. Va.

Feb. 3, 2021) (same). His entire discussion of K.R.'s impairment-related limitations in the

challenged Domains appears in two terse paragraphs:

> The claimant has less than marked limitation in attending and completing tasks.
> The evidence shows the claimant could be distractible and he has difficulty
> completing tasks at times because he is easily frustrated. The claimant could be
> easily redirected to task, and his distractibility has not interfered with his academic
> achievement. The claimant's inattention has improved with medication. He has not
> required special instruction or modified seating for better focus. (Ex. 4F, 8F, 6E,
> 20E, 26E, 25E).

R. 25 (citing R. 385–93 (Ex. 4F); R. 419–39 (Ex. 8F); R. 232–39 (Ex. 6E); R. 307–14 (Ex. 20E);

R. 331–38 (Ex. 25E); R. 339–43 (Ex. 26E)).

> The claimant has less than marked limitation in interacting and relating with others.
> The evidence shows the claimant could be defiant, and he would refuse commands
> to stop or do something. He has a problem with touching people, although he is not
> aggressive. He is able to appropriately interact with his peers and teachers at school,
> and his defiant behaviors have not led to suspension, fights, behavior modification

10

> strategies/IEP, or an inability to proceed with his day, as he has improved with
> medication. There is evidence of temper tantrums at home, but these became more
> manageable with medication. (Ex. 8F, 5F, 4F).

R. 26–27 (citing R. 385–93 (Ex. 4F); R. 396–403 (Ex. 5F); R. 419–39 (Ex. 8F)). In short, ALJ

Foster "summarized evidence that he found credible, useful, and consistent," but he never

explained how he concluded, "*based on this evidence*," *Woods v. Berryhill*, 888 F.3d 686, 694

(4th Cir. 2018), that K.R.'s severe ADHD interfered "less than" seriously, R. 25, 26, with his

"ability to independently initiate, sustain, or complete activities" in these two domains, R. 18.

*See Sabrina R.*, 2021 WL 3614436, at *6.

Moreover, the exhibits that ALJ Foster cited to support his findings and conclusions

contained mixed evidence about K.R.'s age-appropriate functioning and impairment-related

limitations throughout the relevant time. *See* R. 21–23 (summarizing exhibits). For example,

Exhibit 6E is a questionnaire that K.R.'s preschool teacher Phyllis DeLoatch completed in early

May 2018. R. 21 (citing R. 232–39). Ms. DeLoatch opined that compared to children his age

who do not have impairments, K.R., then four years old, had no problems interacting and relating

with others (e.g., seeking attention appropriately, following rules, taking turns in conversation),

R. 235, and only a "slight problem" with a few specific skills necessary to attending and

completing age-appropriate tasks (i.e., paying attention when spoken to directly, following multi-

step instructions, and working without distracting himself or others), R. 234. K.R. had "no

problem" focusing long enough to finish an assigned activity or task, changing activities without

being disruptive, or refocusing to task when necessary. R. 234. Exhibit 25E is a similar

questionnaire that K.R.'s first-grade teacher Ms. Vernon completed in late September 2019,

when K.R. was six years old. R. 21 (citing R. 331–37). Ms. Vernon opined that, compared to

other children his age who do not have impairments, K.R. had "obvious problem[s]" seeking

attention appropriately, following rules, taking turns in conversation, focusing long enough to

finish an assigned activity or task, changing activities without being disruptive, and working without distracting himself or others. R. 333–34.[9] K.R. exhibited most of these limitations every school day. *See id.* ALJ Foster summarized Ms. DeLoach's and Ms. Vernon's differing opinions, R. 21, but he did not explain how he reconciled this information in making certain factual findings—such as that K.R. "could be distractible" but was "easily redirected to task" and that K.R. was "able to appropriately interact with peers and teachers"—or in concluding that K.R.'s ADHD interfered to some "less than" serious degree with his ability to attend/complete tasks and interact/relate with other people at an age-appropriate level, R. 25–27. *Susan T. v. Soc. Sec. Admin.*, No. 5:17cv26, 2018 WL 4655753, at *11 (W.D. Va. Sept. 27, 2018) ("[I]t is not enough for the ALJ to summarize the relevant evidence if he then fails to adequately explain how he resolved material ambiguities or conflicts . . . and why the credited evidence supports his findings and conclusions." (citing *Woods*, 888 F.3d at 695)).

Exhibits 4F, 5F, and 8F are treatment notes documenting K.R.'s varied response to ADHD medications. K.R. started taking Intuniv at age four, after his preschool teacher reported that he had "trouble keeping his hands to himself" and was "fidgety, wiggly, restless, out of his seat, blurting out, [having] trouble staying focused and on task and completing assignments in a reasonably timely manner." R. 385 (Feb. 2018). After six weeks on 1mg Intuniv, K.R. was "somewhat clam[er] . . . and able to stay in his seat and follow directions and [was] not spinning around on the floor during reading time." R. 387 (Apr. 2018). Two months later, K.R.'s preschool teacher reported that he was "more fidgety," "restless," "talkative," and "disruptive." R. 389 (June 2018). Latisha noticed similar behaviors at home and felt K.R. was "slipping back

---

[9] Both questionaries instruct teachers to rate the child's relative limitations using the following scale: (1) no problem; (2) a slight problem; (3) an obvious problem; (4) a serious problem; and (5) a very serious problem. R. 233–37, 332–36. Those terms are not defined on the questionnaire. *See id.*

to where he was before the medication." *Id.* Increasing the Intuniv to 2mg made K.R. "extremely

lethargic" during the school day. R. 399 (Sept. 2018). Switching back to 1mg improved his

inattentiveness and "outbursts or explosive behavior" for a few months. R. 418 (Jan. 2019); *see*

R. 420 ("[He] has been struggling somewhat more with impulsivity and hyperactivity and his

focus is not as good as it was before." (Apr. 2019)); R. 422 ("At times he would become

frustrated and even start growling when he was not able to accomplish things and tasks set before

him." (July 2019)). By the fall of 2019, however, six-year-old K.R. was "talking in class and

unable to stop, playing in class and either refusing or unable to stop[,] and playing with the

elevator buttons after being told several times to stop." R. 427 (Sept. 2019). Pediatric psychiatrist

Richard Claytor, M.D., opined that alternating 1mg and 2mg "Intuniv appear[ed] to be helping

[K.R.'s] ADHD symptoms to an extent, [but] he continue[d] to struggle with hyperactive and

impulsive as well as disruptive behaviors." R. 435 (Oct. 2019). He started K.R. on a trial of

Strattera and recommended that K.R. attend "regular individual and family therapy to improve

interpersonal relationships and communication." R. 438. Dr. Claytor's progress notes also

document K.R.'s "impaired" concentration and at times "tangential" thought process on mental-

status exams throughout the relevant period. R. 387, 389, 392, 399, 402, 421, 423, 429–30, 436–

37. Again, ALJ Foster summarized parts of these records, R. 22–23, but he did not explain how

he weighed the evidence in making certain factual findings—such as that K.R.'s inattention and

defiant behaviors *both* "improved with medication"—or in concluding that K.R. had "less than"

serious limitations attending/completing tasks and interacting/relating with people compared to

other preschoolers and school-age children who do not have impairments, R. 25–27. *See Susan*

*T.*, 2018 WL 4655753, at *11 (citing *Woods*, 888 F.3d at 695).

ALJ Foster's "apparent reliance on mixed evidence about the 'activities [K.R.] can and cannot do,' without logically explaining how he weighed that information considering the pertinent factors, also raises concern that he misapplied the Commissioner's 'whole child' approach by 'averaging' [K.R.'s] strengths and weaknesses to come up with a rating" for each "domain as a whole," *Cynthia N. obo Z.N.S. v. Saul*, No. 4:18cv38, 2019 WL 4658391, at *4 (W.D. Va. Aug. 29, 2019) (quoting SSR 09-1p, 2009 WL 396031, at *10), *adopted*, 2019 WL 4644550 (W.D. Va. Sept. 24, 2019) (reversing and remanding where ALJ made the same error). That error was not harmless in this case. *Compare id.* at *4, *9, *with Bryant*, 63 F. App'x at 91, 94–96 (affirming where ALJ explained how he weighed child's "mixed record of normal functioning in some areas combined with meaningful limitations in others" when denying benefits).

ALJ Foster also committed reversable legal error when weighing Latisha's testimony describing how K.R.'s ADHD and related symptoms limited his abilities to attend and complete tasks and interact and relate with others when compared to other children his age(s) who do not have impairments. *See* Pl.'s Br. 18–22 (citing R. 21–22). "Symptoms," or the claimant's own description of his medical condition, play a crucial role in a proper functional-equivalence assessment. SSR 09-1p, 2009 WL 396031, at *2. "If the claimant is a child who does not describe, or cannot adequately describe, his symptoms the ALJ will accept as a statement of [the child's] symptom(s) the description given by the person who is most familiar with [the child], such as a parent, other relative, or guardian." *Gerette*, 2016 WL 1254611, at *8. ALJs follow a two-step process to evaluate these subjective descriptions. *See id.*; 20 C.F.R. § 416.929.

"First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Lewis*, 858 F.3d at 866. Second, assuming the

claimant clears the first step, the ALJ must evaluate the intensity, persistence, and limiting

effects of the child's symptoms to determine the extent to which they limit his or her ability to

function at an age-appropriate level. *See Gerette*, 2016 WL 1254611, at *8; 20 C.F.R. §

416.929(c). "The second determination requires the ALJ to assess the credibility of statements

about symptoms and their functional effects," *Lewis*, 858 F.3d at 866, based on all the relevant

evidence in the record. 20 C.F.R. §§ 416.924a, 416.926a, 416.929(c)(3). The ALJ must give

specific, legally adequate reasons supported by "references to the evidence" for the weight

assigned to the claimant's description of her medical condition. *Edwards v. Colvin*, No. 4:13cv1,

2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013); *see also Bishop v. Comm'r of Soc. Sec.*, 583

F. App'x 65, 68 (4th Cir. 2014) (per curiam) (citing *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011

(4th Cir. 1997)). And, although the reviewing court will defer to an ALJ's adverse credibility

finding absent "exceptional circumstances," *Bishop*, 583 F. App'x at 68, his written decision

must at least "build an accurate and logical bridge from the evidence to his conclusion" that the

claimant's statements were not credible, *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016)

(quotation marks omitted). ALJ Foster's decision does not meet these minimum standards.

  In October 2019, Latisha testified that K.R.'s ADHD symptoms and disruptive behavior

were "getting worse each year" since she applied for SSI in the spring of 2018. *See* R. 47, 49.

When K.R. was four and five years old, his primary problems at school were "spinning in circles

plus not listening" while he and his classmates were supposed to be focused on lessons. R. 49–

50; *see* R. 25 (noting that "a preschooler without an impairment should be able to . . . sustain

attention to his play and learning activities"). Starting K.R. on ADHD medication helped for a

while. *See* R. 46–48. By the time K.R. was six and in the first grade, however, he was kicking

over classroom furniture and "moving all the desks out of the way" because he did not want to

stop an activity when instructed to do so. R. 51 (testifying that K.R. did not follow classroom rules); *see* R. 334 (Ms. Vernon's opinion that K.R. had "obvious problems" on a daily basis following rules and changing activities without being disruptive). K.R. got "along with [kids] until they [took] something from" him, at which point he would "hit[] them." R. 51; *see also* R. 41 ("He's refusing to do his homework; he's kicking desks, he's pushing them out the way; . . . he's hitting the kids if they're taking stuff from them, he hits them; he's not listening."). The assistant principal had to talk to K.R. in the cafeteria and sometimes implemented "silent lunch for his behaviors." R. 43. His first-grade teacher told Latisha that K.R. "refused" to do classwork and was slow to complete tasks, but she did not "say how long it takes" him to finish. R 42; *see* R. 333 (Ms. Vernon's opinion that K.R. had "obvious problems" on a daily basis focusing long enough to finish assigned tasks and working without distracting himself or other children).

K.R. also had trouble focusing and following rules outside school. *See* R. 43–47 (home); R. 49 ("He's still pretty hyper, and it doesn't matter where we are, in church, school, doctor's office; he's just hyper."); R. 52–53 ("[H]e has to be redirected as far as his focus goes" during basketball practice and games). Latisha had to sit with K.R. while he did his homework because he would not stay put, R. 43, and even then it took him "[t]hirty minutes to an hour" to finish assignments that should take ten minutes, R. 44. When K.R. was "in one of his moods," he would "growl" at his parents and throw temper tantrums. R. 44–45. This happened about once a week. R. 45. K.R. and his siblings were responsible for cleaning their bedroom and toy room. R. 46. Latisha often had to "stay on him" to pick up all of his belongings because he was "defiant" and "[n]ot focusing." *Id.*

ALJ Foster referenced Latisha's testimony only in his summary of the lay evidence. R. 21; *see generally* R. 23–29 (citing teacher questionnaires, treatment records, and DDS medical

opinions to support limitation ratings). He found that K.R.'s severe ADHD could reasonably be

expected to cause the symptoms that Latisha described, but that the alleged intensity, persistence,

and limiting effects of those symptoms were "not entirely consistent with the medical evidence

and other evidence in the record for the reasons explained in [his] decision." R. 22. Rather than

articulate any *specific* reasons for discounting Latisha's allegations, however, ALJ Foster

appears to have simply "summarized the evidence that he found credible, useful, and consistent,"

*Woods*, 888 F.3d at 695, with his conclusion that K.R.'s severe ADHD caused "less than

marked" limitations in Domains II and III, R. 25–27. Without an explicit explanation of why

ALJ Foster discounted—if not outright rejected—Latisha's testimony describing her son's

impairment-related symptoms and functional limitations in these areas, *see* R. 25 ("The [school-

age] child should be able to . . . stay on task and in place when appropriate. The child should be

able to sustain attention well enough to participate in group sports, read by himself, and complete

family chores."); R. 26 (noting that a child who "has difficulty playing games or sports with

rules" is limited in interacting/relating with others), I cannot conclude that the ALJ's functional

equivalence assessment is both legally adequate and supported by substantial evidence in the

record, *Elsie L.*, 2018 WL 6981223, at *3–7 (reversing and remanding where ALJ made same

error). *See also Bates v. Berryhill*, 726 F. App'x 959, 960 (4th Cir. 2018) (vacating denial of

benefits and remanding where, "reading the ALJ's decision as a whole, the ALJ failed to make

findings pertinent to" mandatory listing-level analysis, and noting that the court "will not divine

a rationale for any implicit conclusion" that claimant's severe impairment did not meet the

listing).

***

I take no position on whether K.R. is entitled to childhood disability benefits. On remand, the Commissioner must consider and apply the correct legal rules to all relevant evidence in the record, explain how any material inconsistencies or ambiguities were resolved at each critical step of the disability determination process, and provide an accurate, logical description of how specific evidence supports each finding or conclusion in the functional equivalence assessment.

## V. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** the Plaintiff's motion for summary judgment, ECF No. 16, **DENY** the Commissioner's motion for summary judgment, ECF No. 18, **REVERSE** the Commissioner's final decision denying K.R.'s claim for childhood SSI benefits, **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: January 11, 2022

18

Joel C. Hoppe
United States Magistrate Judge